# United States Court of Appeals
## For the First Circuit

Nos. 16-1917, 16-1923

NELSON R. SHARP; DESTINY YACHTS, LLC,

Plaintiffs-Appellees/Cross-Appellants,

v.

HYLAS YACHTS, LLC,

Defendant-Appellant/Cross-Appellee,

GMT COMPOSITES, INC.; FORESPAR PRODUCTS CORP.,

Third Party Defendants-Appellees,

MASTERVOLT, INC.,

Third Party Defendant.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Jennifer C. Boal, U.S. Magistrate Judge]

Before

Lynch, Kayatta, and Barron,
Circuit Judges.

Jeffrey S. Baker, with whom Baker and Associates, Daniel P. Tarlow, and Copani, Tarlow & Cranney, LLC were on brief, for defendant-appellant.
Robert E. Collins, with whom Clinton & Muzyka PC was on brief, for third-party defendant-appellee GMT Composites, Inc.
Stefan L. Jouret, with whom Jouret LLC, Warren D. Hutchison, and LeClair Ryan PC, were on brief, for plaintiffs-appellees.

September 22, 2017

**KAYATTA**, **Circuit Judge**.  Following an eleven-day jury trial and verdict, the district court entered judgment against Hylas Yachts, LLC and in favor of plaintiffs Nelson Sharp and his LLC, Destiny Yachts, in the amount of $663,774 plus interest and costs, on account of numerous defects in a brand-new yacht that Hylas custom built and sold to plaintiffs.  Both sides appeal.  For the following reasons, neither side persuades us to upset the judgment.

## I.  Background

To frame the principal issues raised on this appeal (Hylas's challenges to the verdict and plaintiffs' challenge to the judgment as a matter of law entered on one of its claims), we summarize the relevant evidence as a reasonable factfinder might have viewed it most favorably to plaintiffs.  See Atl. & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd., 369 U.S. 355, 364 (1962); Acevedo-Garcia v. Monroig, 351 F.3d 547, 565 (1st Cir. 2003).

Our summary begins in June of 2009, when Sharp and Hylas signed a contract for the purchase and sale of a new seventy-foot yacht, to be named "Destiny," for $1.99 million.  A semiretired mechanical engineer with a background in hydraulics, Sharp had owned a boat before—two years prior, he had purchased a fifty-four-foot sailboat from another company—but never a vessel as big as the one he planned to buy from Hylas, a luxury yacht seller in Marblehead, Massachusetts.

The purchase agreement between Sharp and Hylas included detailed provisions devoted to the yacht's commissioning, the delivery and closing, and assorted warranties. The agreement provided that the yacht would be commissioned in Ft. Lauderdale, Florida, and commissioning would "include all work necessary to install all equipment . . . and place same in good and proper operating condition." The agreement also included a warranty provision in which Hylas guaranteed that the yacht delivered to Sharp would be "of excellent quality, of good workmanship and materials, seaworthy and suitable for its intended use of extended ocean cruising." Hylas agreed "for a period of three (3) years after Delivery, to either fix any warranty defects by the factory or reimburse [Sharp] for the cost incurred in fixing it." And Hylas agreed to indemnify Sharp from claims brought by Hylas's subcontractors and suppliers, and to pay attorneys' fees incurred by Sharp in handling such claims.

To build the yacht, Hylas contracted with a number of vendors who supplied, installed, and serviced certain components of the yacht. GMT Composites, Inc. supplied the boom (a "long spar used to extend the foot of the sail") and all boom-related components, including the boom-furling system, part of the gooseneck assembly, the mandrel, and the pawl assembly. Forespar Products Corp., another vendor, supplied the mast, the plates

connecting the mast to the gooseneck assembly, and other parts of the gooseneck assembly.

Sharp made a substantial down payment to Hylas on July 12, 2010, from his personal bank account. The remaining balance was paid at closing from a bank account held by Destiny Yachts, LLC, a limited liability company Sharp set up. When Sharp closed on and took possession of the yacht on December 4, 2010, he did so on Destiny Yachts' behalf as its sole member. From that point forward, Destiny Yachts owned Destiny in full.

After taking possession of the yacht, Sharp sailed from Ft. Lauderdale toward St. Thomas in the Caribbean on December 4. About four or five hours into the maiden journey, Sharp noticed a hydraulic fitting leaking. He turned the boat around and a Hylas employee in Ft. Lauderdale met him the following morning and tightened the fitting. Within a day and a half of Sharp's second departure from Ft. Lauderdale, though, the fitting began to leak again. A more "massive failure" occurred a few days later when the boom came loose, the furling motor connections and hydraulic lines broke, and hydraulic oil spilled on Destiny's deck. When Destiny arrived in St. Thomas, Hylas and GMT arranged for a local rigging company called Island Rigging to repair the boom and the hydraulics.

Between January 4, 2011, and February 26, 2011, Destiny sailed through the Caribbean to Grenada. The yacht had numerous

other problems during its journey, including hydraulic system malfunctions, malfunctions of the electronic throttle, a broken generator, failing battery chargers, and toilet malfunctions. Sharp corresponded repeatedly with Hylas and GMT, expressing his dissatisfaction with the services Hylas was rendering and frustration with the continuing problems his crew was experiencing. Sharp later recalled spending several weeks in Grenada trying to repair the hydraulic system, which continued to fail, and the charging system, which by this point "was almost non-existent." When Sharp could not get these systems repaired, he decided to return to Ft. Lauderdale so that Hylas could effect repairs before Destiny would continue on to the Mediterranean.

On April 7, 2011, the yacht left Grenada for Ft. Lauderdale. During the trip, the clevis pin fell out of the boom, causing the boom to completely fall off the mast. Sharp eventually put in at Ft. Lauderdale to undergo repairs. Hylas sent the hydraulic system manufacturer to replace the controls for the hydraulic system, and sent the charging system manufacturers to replace the charging system. A GMT technician repaired the damage done when the boom fell.

Problems continued to arise. They included boom-fitting, mandrel, foot-track, and hydraulic oil issues. Destiny eventually docked in Newport, Rhode Island, where it underwent eight days of repairs. Graham Robertson, who joined the crew as

Destiny's captain in June 2011, recalled that GMT performed all of the repairs; nobody from Hylas was involved.

On June 23, 2011, Destiny left Rhode Island for the Mediterranean. Sharp received an email from Hylas's vice president, Kyle Jachney, the day before the yacht departed, stating that Jachney planned to come see the yacht and conduct sea trials. Destiny departed before Jachney made it, however. While the yacht was sailing across the Atlantic, Robertson noticed that in addition to emerging problems with the mandrel foot track and the sail feeder, the bolts in the boom fitting connecting the boom to the mast appeared to be loosening. Destiny could not be sailed, and had to travel using a motor to get to the Azores for repairs; nobody there could fix it, so it made its way unrepaired to Palma de Mallorca.

On June 27, 2011, Sharp forwarded to Jachney an email he had received from Robertson describing all of these problems, and Sharp asked Jachney to "provide your insights and suggested course of action." Roughly two weeks later, Sharp, who had at this point made his way to Palma de Mallorca to tend to Destiny, emailed Jachney again to state that he had received no response to his email request, and that he and Destiny's crew were going to "proceed[] to the best of [their] ability to effect a fix that will still salvage part of the Summer in the Mediterranean." Sharp indicated that he would be forced to conduct repair work and he

expected Hylas to reimburse him for the work and the value of the lost use of the yacht. He also reminded Jachney that Hylas did not ever provide Destiny's hydraulic system schematics despite Sharp's request for them in early May 2011.

Taking the advice of mechanics who said some of the parts connecting the boom and mast were undersized, Sharp had the mast connection rebuilt and increased the size of the clevis. Still, subsequent emails he sent to Jachney and David Schwartz, the president of GMT, alerted Hylas and GMT that Destiny continued to experience problems with loosening screws and bolts in the boom along with continual hydraulic leaks.

On July 31, 2011, Destiny left Palma de Mallorca and experienced more problems, this time with the pawl (the component used to raise and lower the sail). After stopping for more repairs in Sardinia, Destiny resumed its journey through the Mediterranean on August 5, 2011.

On October 13, 2011, plaintiffs sued Hylas, alleging breach of contract, breach of warranties, negligence, misrepresentation, and violations of Massachusetts General Laws chapter 93A. Hylas impleaded GMT and Forespar, and GMT leveled fourth-party contract claims against plaintiffs based on a bill it issued that was allegedly never paid.

As Destiny headed back across the Atlantic in November 2011, more screws in the boom-to-mast connection broke or loosened.

Robertson noticed that bolts in the gooseneck were shearing; he instructed the crew to check them twice a day, and at least one bolt required tightening at each check. The pawl assembly again had problems, as did the bolts in the gooseneck assembly, so the yacht sailed the last few days into the Carribean under reduced sail. After the yacht made its way to Newport, Rhode Island from Ft. Lauderdale in June 2012, Sharp eventually had the boom replaced in early September 2012. No further significant problems ensued.

The case went to trial in July 2015. Plaintiffs claimed damages of $1,019,066, consisting of $320,000 in lost charter revenue, $364,514 in depreciation during the 8-1/2 months when Destiny could not be used, $140,789 to replace the gooseneck and boom, and assorted lesser amounts for other repairs, travel, lost time, and marina and diversion expenses.

The jury signed a special verdict form in which they found that Hylas's breach of contract and breaches of implied and express warranties rendered it liable to Sharp in the amount of $663,774. The jury also found that GMT breached its contract with Hylas and breached an express warranty and implied warranties of merchantability and workmanlike conduct, and that at least one of these breaches proximately caused harm to Hylas. But the jury found that Hylas was entitled to no damages from GMT, the liability findings notwithstanding. The jury found against Hylas on all of its contract claims against Forespar, and found that plaintiffs

did not breach a contract with GMT or become unjustly enriched by failing to pay an unpaid bill. A few months later, the magistrate judge found against plaintiffs on their chapter 93A claims. Hylas's post-trial motions were denied, and Hylas and plaintiffs both appealed.

## II. Discussion

Hylas complains that the jury verdict holding it liable to Sharp for a substantial sum was necessarily inconsistent with the jury's verdict that GMT, the boom supplier, breached contractual commitments and warranties given to Hylas, yet owed Hylas no damages. Hylas also argues that the district court improperly dismissed its indemnification claim against GMT, and that the verdict was tainted by erroneous instructions, improperly admitted evidence, and a failure to hold Sharp accountable for the spoliation of evidence. Plaintiffs, in turn, press on cross appeal the contention that they were entitled as a matter of law to multiple damages and attorneys' fees under Massachusetts state law. Mass. Gen. Laws ch. 93A, § 11. As we will explain, none of these arguments persuade us.

## A. Damages evidence

Hylas claims that the trial court abused its discretion in allowing plaintiffs to put into evidence and claim as damages the $320,000 in alleged lost charter revenues and the roughly $536,000 in depreciation, crew salaries and expenses, fuel costs,

marina charges, and Sharp's own time and expense. In maritime law, such amounts are sometimes referred to as "demurrage" or "detention damages." Hylas's argument is that Destiny was a pleasure craft owned for personal use, not a commercial charter, hence detention damages are not recoverable in this breach of contract action.

Hylas rests this argument on the Supreme Court's decision in The Conqueror, 166 U.S. 110 (1897), a case in which the Court found that the owner of a pleasure yacht could not recover damages for loss of pleasure use. Id. at 133. The Court observed that "the loss of profits or of the use of a vessel pending repairs, or other detention, arising from a collision or other maritime tort, and commonly spoken of as 'demurrage,' is a proper element of damage," but only "when profits have actually been, or may be reasonably supposed to have been, lost, and the amount of such profits is proven with reasonable certainty." Id. at 125. With no evidence that the yacht owner had any interest in engaging the vessel in "profitable commerce," the Court found that such proof was lacking. Id. at 133.

The Conqueror arose under markedly different circumstances: It disposed of an action alleging a maritime tort under admiralty law, not contract claims possibly governed by Massachusetts law. Hylas does not expressly argue that federal maritime law applies, nor do plaintiffs argue that it does not.

- 11 -

Notably, however, the parties did not object to the district court's instruction to the jury that plaintiffs are not entitled to any damages based on "any loss of use . . . for recreational purposes," because "[m]ere inconvenience arising from an inability to use the vessel for purposes of pleasure is not recoverable." They also agreed to the district court's instruction that lost profits and lost charter revenues could be recovered if proven "with a reasonable degree of certainty." These instructions suggest that the parties implicitly agreed to the application of The Conqueror's framework in this case. We therefore assume, without deciding, that The Conqueror applies fully to plaintiffs' claims; hence, Sharp cannot recover damages for lost pleasure use of a pleasure vessel.

Observing that plaintiffs did not produce brochures, hire a broker, or otherwise make any effort to charter Destiny at any point during the several months they claimed losses prior to filing suit, Hylas argues that it was inappropriate for the jury to consider evidence of the damages plaintiffs allegedly incurred in lost profits and use of Destiny pending repairs.[1]   The

---

[1] Specifically, Hylas takes issue with Trial Exhibit 38, a summary of Sharp's calculations of the damages he sought against Hylas, which was admitted over objection during Sharp's testimony at trial. Because we find that it was not an abuse of discretion for the magistrate judge to allow Sharp's testimony and evidence concerning detention and demurrage damages, we need not address plaintiffs' argument that Hylas failed to preserve its objection by not repeating its objection at the time Exhibit 38 was finally

- 12 -

Conqueror's holding, however, is not so broad.  While it does provide that the owner of a pleasure craft may not recover based on the loss of pleasure use that occurs when a vessel needs repairs, it does not purport to bar the owner of a multipurpose vessel from recovering damages attributable to lost business use. See Oswalt v. Resolute Indus., Inc., 642 F.3d 856, 864–65 (9th Cir. 2011) (distinguishing The Conqueror and affirming an award of business-related and nonspeculative loss-of-use damages).  The Conqueror did not reach so broadly because the record was devoid of any testimony "tending to show that [the vessel owner] bought [the vessel] for hire, or would have leased [the vessel] if he had been able to do so."  166 U.S. at 133–34.  Circuit courts have, in turn, adopted a rule allowing owners of multipurpose vessels to recover detention and demurrage damages where owners can show with "reasonable certainty" that those damages arose from lost business use rather than lost pleasure use.  See, e.g., Cent. St. Transit & Leasing Corp. v. Jones Boat Yard, Inc., 206 F.3d 1373, 1376–77 (11th Cir. 2000); Oswalt, 642 F.3d at 864–65.

According to Hylas, the "reasonable certainty" standard can only mean that "to be awarded damages for lost profits, a recreational vessel must have a history of income.  Absent such history, these damages are too speculative and cannot be awarded."

---

entered into evidence and by stipulating to the admission of another exhibit containing a copy of the contents of Exhibit 38.

- 13 -

But no court has crafted so strict a rule. Instead, courts have consistently observed that "what constitutes 'reasonable certainty' is of necessity a fact-intensive inquiry in which the issue of evidentiary sufficiency can only be determined on a case-by-case basis." Yarmouth Sea Prods., Ltd. v. Scully, 131 F.3d 389, 395 (4th Cir. 1997). Although courts typically require a showing that the vessel "has been engaged, or was capable of being engaged in a profitable commerce," Delta S.S. Lines, Inc. v. Avondale Shipyards, Inc., 747 F.2d 995, 1001 (5th Cir. 1984) (internal quotation marks omitted), we have previously stated:

> The burden of proof imposed on a vessel owner claiming demurrage is not excessive:
> "It is not necessary for him to show by direct evidence that he would have employed his vessel . . . . It suffices if he shows a state of facts from which a court or jury can find that there was an opportunity to do so, and that he would have availed himself of it."

Trans-Asiatic Oil Ltd., S.A. v. Apex Oil Co., 804 F.2d 773, 782 (1st Cir. 1986) (quoting Skou v. United States, 478 F.2d 343, 346 (5th Cir. 1973)); see also Jackson v. Innes, 121 N.E. 489, 491 (Mass. 1919) (citing The Conqueror for the proposition that a defendant "cannot avoid liability" for "the loss of the use of [a] boat during [a] period of detention" merely because "no income was derived from it," and observing that "evidence of the fair market rental value for the use of the boat was admissible on the question of damages").

- 14 -

Hylas's fallback argument is that the evidence was insufficient to warrant treating Destiny as other than a pleasure craft for the noncommercial use of Sharp and his friends and family. Hylas notes that the evidence shows that the insurance policy on Destiny covered only Sharp's private use of the yacht, and that Sharp did not take a business deduction on the yacht when he filed his taxes the year he made the purchase. But the record also includes Sharp's testimony that he formed Destiny Yachts LLC—prior to closing on and taking possession of Destiny—"because [he] was going to charter the yacht," so he "wanted to put it into, essentially, a corporate shell." Sharp explained that seventy-foot yachts like Destiny are very expensive to maintain, and he did not plan to live his life at sea, so he intended from the start to charter the yacht during the extensive amount of time each year that he himself would be unavailable to sail. The record also included undisputed evidence that Destiny was eventually regularly chartered at a rate of $20,000 per week after all repairs were completed. The fact that this occurred after suit was filed is a talking point for Hylas's attorney, but not a bar to a jury concluding that Sharp would have "availed himself" of the opportunity to charter Destiny sooner if it were not for the yacht's constant need of repairs. Trans-Asiatic Oil, 804 F.2d at 782.

All in all, the trial court had before it a mixed record, with some evidence supporting the conclusion that Sharp would have chartered the yacht but for its troubles, and other evidence pointing to the contrary. This is why we have jurors. And in this case, the duly empaneled jurors were properly instructed that plaintiffs had to prove their lost profits to a "reasonable degree of certainty." On such a record, the trial court certainly did not abuse its discretion in allowing plaintiffs to offer their evidence of damages for the jury's evaluation.

## B. Spoliation of evidence

In June of 2012, plaintiffs notified Hylas that they planned on replacing the boom in September. Seven weeks later, Hylas requested to conduct a sea trial of Destiny. The following week, Hylas conducted an inspection of Destiny, and voiced no concerns regarding the vessel's seaworthiness. On August 31, the magistrate judge ordered plaintiffs to turn over the yacht to Hylas for a sea trial. When plaintiffs did so the following week, the yacht was unsafe to sail. Before Hylas could reschedule a sea trial, plaintiffs replaced the boom. Hylas claimed that by replacing the boom, plaintiffs had effectively and in bad faith destroyed evidence. It moved for sanctions, seeking dismissal or at least an instruction to the jury that they were "entitled in [their] deliberations to draw a negative inference form [sic] the fact that the Plaintiffs have precluded by their conduct the

- 16 -

Defendants from adequately and fairly testing the components while the Yacht is under sail."

In response to Hylas's request for dismissal, the district court held a two-day evidentiary hearing on spoliation. The court ultimately concluded that "the vessel was delivered for the sea trials in a conditions [sic] in which it was dangerous to sail." For that reason, the district court ordered plaintiffs to "pay the defendants' reasonable expenses in arranging to be present at the sea trial." The district court declined, however, to dismiss plaintiffs' claims against Hylas. Later, the district court also declined to give an adverse-inference instruction to the jury concerning spoliation of evidence. On appeal, Hylas challenges the district court's refusal to grant its requests,[2] which we review for abuse of discretion. See Booker v. Mass. Dep't of Pub. Health, 612 F.3d 34, 46 (1st Cir. 2010).

Neither an adverse-inference instruction nor dismissal was required. Although it is true that "an adverse inference

---

[2] In a heading in its opening brief, Hylas frames its argument as asserting that it was an abuse of discretion not to impose "any sanction . . . based on spoliation of evidence." (Emphasis added). But beyond this general statement, Hylas does not advance any further argument that the district court should have imposed some sanction other than dismissal. Any such argument is therefore waived. See Vallejo Piedrahita v. Mukasey, 524 F.3d 142, 144 (1st Cir. 2008) ("It is well settled that issues adverted to on appeal in a perfunctory manner, unaccompanied by some developed argumentation, are deemed to have been abandoned."(internal quotation marks omitted)).

instruction may be allowed when a party fails to produce [evidence] that exists or should exist and is within [the party's] control," Astro-Med, Inc. v. Nihon Kohden Am., Inc., 591 F.3d 1, 20 (1st Cir. 2009), such an instruction "usually makes sense only where the evidence permits a finding of bad faith destruction." United States v. Laurent, 607 F.3d 895, 902 (1st Cir. 2010). The record in this case supports a contrary conclusion: Three months in advance, plaintiffs proactively informed Hylas that they intended to replace the boom in early September. As best the briefs reflect, Hylas never insisted that the replacement be put off until after sea trials were completed. Plaintiffs sent scores of pictures and measurements to Hylas to allow Hylas to prepare for trial. Moreover, the record contained evidence from which the district court could have concluded that during the two years that passed from the time the yacht was commissioned to the date the boom was replaced, Hylas had a number of other opportunities to examine the boom, inspect the yacht, and conduct sea trials. Aside from Hylas's vague reference to the generalized prejudice it suffered from being "precluded from presenting a valid defense" to plaintiffs' claims, Hylas is unable to explain what it thinks it might have discovered upon inspection of the boom that it could not learn from the materials and information plaintiffs provided, or why the time it was given to make accommodations in light of the impending boom replacement was insufficient. In sum, the

district court did not abuse its discretion in concluding, in effect, that "no adverse-inference instruction would make sense here." Laurent, 607 F.3d at 903.

If an adverse-inference instruction was not required, sanctioning the plaintiffs with dismissal was also not required. "The intended goals behind excluding evidence, or at the extreme, dismissing a complaint, are to rectify any prejudice the non-offending party may have suffered as a result of the loss of evidence and to deter any future conduct, particularly deliberate conduct, leading to such loss of evidence." Collazo-Santiago v. Toyota Motor Corp., 149 F.3d 23, 29 (1st Cir. 1998). "While a district court has broad discretion in choosing an appropriate sanction for spoliation, 'the applicable sanction should be molded to serve the prophylactic, punitive, and remedial rationales underlying the spoliation doctrine.'" Silvestri v. General Motors Corp., 271 F.3d 583, 590 (4th Cir. 2001) (quoting West v. Goodyear Tire & Rubber Co., 167 F.3d 776, 779 (2d Cir. 1999)). We have also counseled that, in light of our "prefer[ence] that adjudications be driven by the merits of a case," McKeague v. One World Techs., Inc., 858 F.3d 703, 707 (1st Cir. 2017), dismissal should be granted only in extreme cases. Collazo-Santiago, 149 F.3d at 28 (citing Benjamin v. Aroostook Med. Ctr., Inc., 57 F.3d 101, 107 (1st Cir. 1995)). Here, where Hylas cannot identify the prejudice it allegedly suffered and where the evidence fails to

compel a finding that plaintiffs acted in bad faith, the district court was not required to do more than it did.

## C. Implied indemnity

In its first amended third-party complaint, Hylas sought indemnification against GMT under Massachusetts law. Although Hylas conceded that it did not have an express indemnification agreement with GMT, Hylas claimed that it nevertheless had an indemnity relationship with GMT under an implied contract theory or a tort theory. See Araujo v. Woods Hole Martha's Vineyard, Nantucket Steamship Auth., 693 F.2d 1, 2 (1st Cir. 1982) (describing the three ways an indemnity relationship may arise). By "implied contractual indemnity," Hylas means that, in addition to its warranty obligations, GMT was responsible for "mak[ing] good any loss or damage incurred by [Hylas] while acting at [GMT's] request for [its] benefit"; in other words, for reimbursing Hylas for any and all damages incurred by Sharp in connection with the boom. Although the claim survived a summary judgment motion from GMT prior to trial, it eventually fell to a motion for judgment as a matter of law. The district court found that the record was devoid of evidence that showed the contractual relationship between Hylas and GMT to be of the type that can give rise to implied indemnity. It also found that "common law" indemnification could not be shown because common law indemnification exists under Massachusetts law only in tort actions.

Hylas contends that the district court erred in dismissing the indemnity claim, arguing that the record included enough evidence to withstand summary adjudication on the question whether Hylas had an implied contractual indemnity relationship with GMT.[3] Pointing to evidence that GMT conducted repairs, gave advice, offered redesigns, and interacted directly with plaintiffs and third-party repairers of GMT components, Hylas argues that GMT was far more than just a boom vendor that contracted with Hylas as its vendee. Rather, says Hylas, this evidence, along with the warranties GMT provided to Hylas on the boom and the service and support GMT provided "above and beyond its claimed contractual obligations," shows that GMT built a "special relationship" with Hylas whereby Hylas would not be liable to others for any boom-related damages. We review the district court's decision granting GMT's motion for judgment as a matter of law de novo, viewing the evidence and the reasonable inferences that can be drawn therefrom in the light most favorable to Hylas. See Delgado v. Pawtucket Police Dep't, 668 F.3d 42, 50 (1st Cir. 2012).

In contending that it had a "special relationship" with GMT, Hylas misunderstands the way a relationship between parties can override the absence of an express indemnity agreement to create an indemnification obligation under Massachusetts law.

_____

[3] Hylas does not challenge the district court's finding that common law indemnity could not be shown.

- 21 -

Contrary to Hylas's contention, merely going "above and beyond" what is required under a contract does not create a "special relationship" that implies indemnity.  Rather, for a relationship to generate an obligation to indemnify, the relationship must be "generally recognized" as special.  Fireside Motors, Inc. v. Nissan Motor Corp., 479 N.E.2d 1386, 1391 (Mass. 1985).  Hylas does not contend that its relationship with GMT is generally recognized as one that establishes indemnity.  Instead, it argues that a plethora of evidence adduced at trial demonstrated that GMT was more involved with repairs than the contract demanded, working directly with plaintiffs, assuming primary control over everything related to the boom, and demonstrating its willingness to be more than merely a vendor who relinquished its handiwork to its vendee.  Hylas essentially contends that "'special factors' surround[ed] the contractual relationship which indicate[d] an intention by one party to indemnify [the other] in [this] particular situation."  Fall River Housing Auth. v. H.V. Collins Co., 604 N.E.2d 1310, 1313 (Mass. 1992) (quoting Decker v. Black & Decker Mfg. Co., 449 N.E.2d 641, 644 (Mass. 1983)); see also Fireside Motors, 479 N.E.2d at 1391 (recognizing that a right to indemnification may be implied "when there are unique special factors demonstrating that the parties intended that the putative indemnitor bear the ultimate liability" (internal quotation marks omitted)); E. Amanti & Sons,

Inc. v. R.C. Griffin, Inc., 758 N.E.2d 153, 162–63 (Mass. App. Ct. 2001).

The nature of the relationship between the parties may be relevant to whether there exist "special factors" that would imply indemnity, but Massachusetts courts "infer[] the existence of indemnity agreements only when the terms of the contract themselves contemplate[] such indemnification."  Larkin v. Ralph O. Porter, Inc., 539 N.E.2d 529, 532 (Mass. 1989); see also Decker, 449 N.E.2d at 643 (distinguishing between an "implied contract of indemnity" and a tort-based "obligation implied from the relationship of the parties").  On the few occasions when the Supreme Judicial Court of Massachusetts has found an implied contractual right to indemnification, it has done so where the natural reading of the contract itself established an indemnity relationship between the parties.  See Larkin, 539 N.E.2d at 532 (collecting cases); Monadnock Display Fireworks, Inc. v. Town of Andover, 445 N.E.2d 1053, 1056–57 (Mass. 1983) (finding town responsible for indemnifying a fireworks company for damages arising from town's failure to furnish police for crowd control it had promised to provide); Great Atl. & Pac. Tea Co. v. Yanofsky, 403 N.E.2d 370, 374 (Mass. 1980) (inferring, from "express agreement" to make all outside repairs, existence of agreement to indemnify for damages from failure to repair).

The district court correctly found that no reasonable juror could infer the existence of an indemnity relationship from the contract between Hylas and GMT. Although Article IV of the contract set forth a warranty "that the Boom delivered to [Hylas] shall be free of all defects of workmanship and engineering, to the extent that such engineering is provided by [GMT], for one year from the date of delivery," this was the "sole warranty" GMT gave to Hylas, and it was "strictly limited" by express terms. GMT warranted that it would repair components that turned out to be defective, but Hylas would be responsible for "transportation to and from the repair facility and for all costs associated with removing and installing the equipment in the boat." GMT made "no warranty . . . as to the duration of any delay necessary for repairs," and expressly disclaimed responsibility "for any damage to the original purchaser or any others for loss of time, inconvenience, loss or damage to personal property, injury to persons, loss of revenue or any other damages consequential or otherwise." Nothing about these warranties, or any other aspect of the contract between GMT and Hylas, signals that the parties contemplated indemnification.[4]

---

[4] GMT and Hylas each devote considerable attention to the question whether the evidence did or did not show that they had forged an ordinary vendor-vendee relationship. But even if GMT was contractually obligated to do more than a typical vendor, which the evidence arguably shows here, that would not be the same as having an indemnification obligation.

As a last resort, Hylas falls back on the argument that judgment as a matter of law was inappropriate because the doctrine of implied indemnity, at least in Massachusetts, is not well defined, as at least one district court has noted: "Massachusetts law on the issue of implied contractual indemnification can perhaps best be described as unsettled." Steffen v. Viking Corp., 441 F. Supp. 2d 245, 251 (D. Mass. 2006). According to Hylas, the fact that the law of implied indemnity may not be fully settled in Massachusetts should prevent a court from being able to grant judgment as a matter of law on the issue. This argument confuses the summary judgment requirement that the material facts be indisputable with a nonexistent requirement that the relevant law be clear and firmly entrenched. In the absence of evidence tending to support the existence of the "special factors" from which Massachusetts courts have inferred a right to indemnification, the district court was correct to grant judgment as a matter of law in favor of GMT.

## D. Jury instructions

In its tenth instruction, the court admonished the jury that if they found "that the boom, mast, or related components were defective, or that repairs performed by GMT were not performed properly, by virtue of the contract, those problems are attributable to Hylas." Out of context, this instruction could have been read in a rather nonsensical manner as indicating that

Hylas could not recover from GMT even if GMT breached its obligations owed to Hylas. And Hylas objected on these grounds.

In context, though, the instruction was clearly directed at explaining that, as between plaintiffs and Hylas, Hylas could not escape liability by passing the buck to its supplier, GMT. The trial court first described plaintiffs' breach-of-contract claim against Hylas; then it described Hylas's waiver defense against plaintiffs' breach-of-contract claim. Next, the court instructed the jury on plaintiffs' breach-of-express-warranties claim against Hylas, plaintiffs' claim that Hylas violated the implied warranty of merchantability, and plaintiffs' claim that Hylas violated the implied warranty of fitness for a particular purpose. The court instructed the jury that plaintiffs' breach-of-warranty claims could not succeed if the jury found plaintiffs did not give reasonable notice.

Only after these instructions concerning plaintiffs' claims against Hylas were given did the court turn its attention to Instruction 10, explaining to the jury the law that governed Hylas's claims against GMT. When it did, the court repeated the elements of a breach-of-contract claim, and reminded the jury of the elements of express- and implied-warranty claims, this time with reference to GMT's potential liability to Hylas. The court explained that Hylas could succeed on its claim of breach of contract against GMT if the jury found by a preponderance of the

evidence that "Hylas performed its obligations under the contract," GMT "breached or violated the contract," and "Hylas suffered damages as a result of the breach of the contract." The jury heard as well that Hylas would have an "entitlement to recover" from GMT if the jury found GMT breached certain warranties.

But, says Hylas, counsel for Forespar in closing pointed to Instruction 10 as meaning that problems with the boom, mast, or related components would be attributable to Hylas, rather than Forespar. Hylas argues that that argument by Forespar spun the instruction in a manner that would cause the jurors to conclude that no damages should be awarded against GMT. As we have just noted, though, the judge expressly told the jurors that Hylas would be entitled to recover damages from GMT if the requisite findings were made. Pointing out that Hylas—rather than Forespar—would be liable to plaintiffs for problems with the boom is not inconsistent with that instruction.

"[A] single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." Cupp v. Naughten, 414 U.S. 141, 146–47 (1973); see McDonald v. Town of Brookline, 863 F.3d 57, 65 (1st Cir. 2017) ("[O]ur role is to evaluate whether the jury instructions as a whole adequately explained the law or whether they tended to confuse or mislead the jury on controlling issues . . . .").

Viewing the instructions as a whole in this case, we see no reason to think that the jurors transplanted a portion of the plaintiffs-versus-Hylas instructions into the Hylas-versus-GMT instructions in a manner that would have made the latter instructions nonsensical.[5]

## E.  Verdict inconsistency

Finally, we arrive at Hylas's central argument on appeal:  that a new trial should be ordered because the jury's verdict was inconsistent.

The jury returned a special verdict in which it found that Hylas (1) breached an express warranty to plaintiffs; (2) breached an implied warranty of merchantability to plaintiffs; (3) breached an implied warranty of fitness for a particular purpose to plaintiffs; and (4) breached its contract with plaintiffs.  Answering "yes" to the question whether "any of the breaches" they found caused plaintiffs harm, the jury determined that plaintiffs were entitled to $663,774 from Hylas.  Next, the jury also found that GMT (1) breached an express warranty to Hylas; (2) breached an implied warranty of merchantability to Hylas; (3) breached an implied warranty of workmanlike product; and (4) breached its contract with Hylas.  Although the jury found

---

[5]  A fortiori, Hylas's identified but unpreserved objection to Instruction 11 (like 10, but referencing the Island Rigging repairs) fails.

that GMT proximately caused harm to Hylas, it ultimately concluded that Hylas was not entitled to any damages from GMT.

Hylas does not dispute that the evidence in the record was sufficient to show that Hylas breached its contract with plaintiffs and breached the warranties expressly and impliedly provided therein. Rather, Hylas contends that because the weight of the evidence adduced by plaintiffs at trial concerned the defective boom GMT provided and the damage caused each time the boom collapsed, fell off the mast, or otherwise malfunctioned, the jury's verdict awarding substantial damages to plaintiffs from Hylas cannot be reconciled with the decision to award no damages to Hylas from GMT, the manufacturer and servicer of the boom.

We are "substantial[ly] reluctan[t] to consider inconsistency in civil jury verdicts a basis for new trials." McIsaac v. Didriksen Fishing Corp., 809 F.2d 129, 133 (1st Cir. 1987) (quoting Merchant v. Ruhle, 740 F.2d 86, 91 (1st Cir. 1984)); see also Climent-García v. Autoridad de Transporte Marítimo y Las Islas Municipio, 754 F.3d 17, 20 (1st Cir. 2014) ("The tide runs strongly against a litigant seeking to overturn a jury verdict."). "When a party claims that jury verdicts are inconsistent, we 'attempt to reconcile the jury's findings, by exegesis if necessary.' This exercise involves determining whether the jury could have, consistent with its instructions, rendered the challenged verdicts." Davignon v. Hodgson, 524 F.3d 91, 109 (1st

- 29 -

Cir. 2008) (citation omitted) (quoting Acevedo-Diaz v. Aponte, 1 F.3d 62, 74 n.15 (1st Cir. 1993)).

It is true that plaintiffs presented a substantial amount of evidence and testimony concerning the defective design, manufacture, and installation of the boom provided by GMT, and the failure of subsequent repairs (rendered by GMT) to fully resolve the problem. But Hylas would have us conclude, from the sheer volume of evidence demonstrating that boom failures resulted in harm to the plaintiffs, that the jury could not consistently find Hylas responsible for over $600,000 in damages to plaintiffs while also finding that GMT owed Hylas nothing. For several reasons, we disagree.

The jury was asked whether any of the breaches by GMT were a "proximate (substantial) cause of any harm suffered by Hylas," to which they responded, "Yes." Hylas places a lot of weight in this answer. But all it means is that the jury concluded that GMT's breaches were a cause of at least some of Hylas's harm. The evidence, in turn, supported a finding that GMT fixed or paid for fixing many problems with the boom. So, if it was these problems that constituted GMT's breach causing harm to Hylas, the jury may have concluded that any resulting loss to Hylas or to the plaintiffs had already been remedied. To the extent that there were alleged problems with the boom that GMT did not remedy, the jury could have found those problems were caused by something other

than a GMT warranty breach (e.g., interfacing components, shoddy outside repair work, or improper use[6]).  Or the jury may not have included other boom costs in plaintiffs' damage award.

There was, after all, evidence that the boom was but one of many components of the yacht that suffered multiple failures of great enough magnitude to require repair and prevent chartering. For example, the jury heard testimony that the hydraulics—which were used to operate "just about everything required to run the boat"—failed "three, four times a week" when plaintiffs first took possession of Destiny, and that Hylas's failure to provide installation drawings or operation manuals (as required by its contract with plaintiffs) made repair work impossible in some situations.  Sharp also testified that during some of the most significant incidents of equipment failure, including a "[c]ouple in particular" in which repairs to the hydraulic systems were needed, "there were big delays in . . . communication" after he reached out to Hylas for support.  In addition, evidence was

_____

[6]    For example, the jury heard evidence that Hylas changed hydraulics systems and added a pressure intensifier to Destiny without informing GMT.  They also heard testimony that "if . . . hooked up to the boom hydraulics, [an intensifier] could put excess pressure above what [GMT] would assume onto [its] system," and that the intensifier was indeed attached to the boom.  On another occasion, heard the jury, the boom fell off the mast not because GMT failed to properly service it, but because Island Rigging (acting on Hylas's behalf) failed to properly set screws during a repair.  And evidence was offered indicating that user error caused at least some of the boom problems.

presented that after Island Rigging made repairs in St. Thomas, Destiny experienced failures of its electronic throttle, generator, battery chargers, and toilets. And the jury heard testimony that the mast, too, had problems that required repair. Sharp and Robertson both testified that a GMT technician who was sent twice to conduct repairs on Destiny had expressed confusion about "why he was there," because the required repairs were not his expertise. Virtually every time Destiny was forced to stop to fix mechanical failures, repairs were required for, and made to, more than just the GMT boom. It is thus not necessarily true that the damages associated with repairs were for boom failures.

Furthermore, even if the jury did award damages for some of the expenses associated with repairing and replacing the boom, they could have found that the damages arose from Hylas's breaches of contract and warranty, not GMT's. To explain why, we must briefly revisit the warranties GMT and Hylas gave.

As we mentioned above, GMT warranted to Hylas that "the Boom delivered to [Hylas] shall be free of all defects of workmanship and engineering, to the extent that such engineering is provided by [GMT], for one year from the date of delivery." GMT promised to pay to repair defectively manufactured components it provided, but expressly stated that Hylas would be responsible for "transportation to and from the repair facility and for all costs associated with removing and installing the equipment in the

boat."  GMT made "no warranty . . . as to the duration of any delay necessary for repairs," and expressly disclaimed responsibility "for any damage to the original purchaser or any others for loss of time, inconvenience, loss or damage to personal property, injury to persons, loss of revenue or any other damages consequential or otherwise."

Hylas, by contrast, more broadly warranted that the yacht would "be of excellent quality, of good workmanship and materials, seaworthy and suitable for its intended use of extended ocean cruising," and guaranteed for three years "to either fix any warranty defects by the factory or reimburse the Buyer for the cost incurred in fixing it."  Hylas also agreed that "[a]ny defects by the factory for issues that apply to the deck and hull for a period of ten (10) years shall be the responsibility of [Hylas]."

An even more obvious and relevant difference between these warranties is that GMT's warranty to Hylas does not cover consequential damages, including all detention or demurrage damages, which were enough by themselves to account for the entire damage award.  Therefore, plaintiffs could have suffered damages of a consequential type that were attributable to Hylas, and for which GMT bore no responsibility.  Hylas's principal rejoinder to this point is that the detention damages were caused by problems with the boom, so GMT should owe Hylas damages for the cost of repair or replacement of the boom.  As we have explained, this is

not clearly correct. But even if the boom problems caused some of the detention damages, it may well have been that those boom problems were the ones for which GMT paid, or were caused by someone other than GMT in using or repairing the yacht. Perhaps the jury found that GMT did, in fact, breach its contract and warranty to Hylas because the boom it provided was faulty, but did not breach the contract's requirement that GMT pay for repairs. After all, the jury heard evidence that all but one of the repairs GMT performed were done at no charge to plaintiffs or Hylas, and the one time GMT charged plaintiffs directly for the repair, no money ever changed hands. The jury then may have found the additional costs associated with boom repairs were for transportation, removal or installation, delay, loss of time, inconvenience, and loss of revenue—items expressly excluded from GMT's warranty to Hylas, but potentially included in Hylas's warranty to plaintiffs, to pay for whatever "cost[s]" plaintiffs "incurred" to fix the yacht.

"An appellate court confronted with a claim of inconsistent special verdicts 'must affirm if there is a view of the case that makes the jury's answers to the interrogatories consistent.'" Kavanaugh v. Greenlee Tool Co., 944 F.2d 7, 9 (1st Cir. 1991) (quoting Mashpee Tribe v. New Seabury Corp., 592 F.2d 575, 590 (1st Cir. 1979), cert. denied, 444 U.S. 866 (1979)). For

the foregoing reasons, there is such a view here. Hylas's verdict-inconsistency claim therefore fails.[7]

## F. Chapter 93A claim

We turn now to plaintiffs' appeal. In their complaint, plaintiffs alleged that Hylas violated Massachusetts General Laws chapter 93A by willfully or knowingly breaching its warranties to the plaintiffs. The parties reserved the chapter 93A claims for post-trial disposition by the court. After trial concluded and the jury found in favor of plaintiffs on their breach-of-contract and warranty claims, the parties submitted proposed findings of fact and rulings of law to the district court. The district court found in favor of Hylas.

On appeal, plaintiffs argue that because the jury found Hylas breached its warranties to plaintiffs, the district court was required to find a chapter 93A violation occurred as well. In plaintiffs' estimation, a breach of warranty under Massachusetts law is a per se chapter 93A violation. Plaintiffs alternatively argue that even if chapter 93A liability is not the per se rule anytime a breach of warranty has been found, Hylas's breaches of warranty were nonetheless deceptive and unfair in contravention of chapter 93A. Plaintiffs therefore ask that we reverse the district

_____

[7] Finding no error by the district court, we also reject Hylas's argument that the district court abused its discretion by refusing to order a new trial.

- 35 -

court and remand for the district court to consider whether chapter 93A's damages multiplier should apply and to calculate an award of attorneys' fees.  We review the district court's legal conclusions de novo, but we conduct that review based on the facts as found by the district court except where those factual findings are clearly erroneous.  McDermott v. Marcus, Errico, Emmer & Brooks, P.C., 775 F.3d 109, 115 (1st Cir. 2014).

Chapter 93A prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Mass. Gen. Laws ch. 93A, § 2(a).  It provides that a court should be "guided by the interpretations given by the Federal Trade Commission and the Federal Courts to section 5(a)(1) of the Federal Trade Commission Act [FTCA]," id. § 2(b), and that the Massachusetts Attorney General may implement "rules and regulations interpreting the provisions" of Chapter 93A, section 2(a) so long as those rules and regulations are not "inconsistent with the rules, regulations and decisions of the Federal Trade Commission and the Federal Courts interpreting the provisions of [the FTCA]," id. § 2(c).

Although "whether or not particular conduct violates Chapter 93A is generally determined on a case-by-case basis," McDermott, 775 F.3d at 117 (citing Kattar v. Demoulas, 739 N.E.2d 246, 257 (Mass. 2000)), Massachusetts courts have identified a few situations in which violation of some other law constitutes a per

se violation of chapter 93A. For example, as identified in McDermott, the Supreme Judicial Court of Massachusetts has recognized that a violation of the state unfair claims settlement act, Mass. Gen. Laws ch. 176D, is itself a violation of chapter 93A pursuant to chapter 93A, section 9(1). Id.; see Polaroid Corp. v. Travelers Indem. Co., 610 N.E.2d 912, 917 (Mass. 1993). Likewise, a violation of the state home improvement contractor's law, Mass. Gen. Laws ch. 142A, has been found to be a violation of chapter 93A not based on a standalone provision of chapter 93A so providing, but based on language in the home improvement contractor's law itself providing that "[v]iolations of any of the provisions of this chapter shall constitute an unfair or deceptive act under the provisions of chapter [93A]," Mass. Gen. Laws ch.142A, § 17.

Plaintiffs insist that this is another such situation, and urge us to follow a regulation promulgated by the Massachusetts Attorney General providing that "[i]t shall be an unfair and deceptive act or practice to fail to perform or fulfill any promises or obligations arising under a warranty." 940 Mass. Code of Regs. § 3.08(2). But, as we explained in McDermott, "the Attorney General is not empowered to issue regulations rendering certain statutory violations 'per se' Chapter 93A violations." 775 F.3d at 120; see also Klairmont v. Gainsboro Rest., Inc., 987 N.E.2d 1247, 1255, 1257 (Mass. 2013) (finding a chapter 93A violation, but holding that a knowing violation of building codes

was not a per se violation of chapter 93A because the Attorney General's regulation at issue covered more than just unfair and deceptive conduct in trade or commerce).  We agree with the district court that the Massachusetts Attorney General's regulation does not require us to find that any and all breaches of warranty are necessarily violations of chapter 93A.

Seizing on our statement in McDermott that there are two "alternative paths to per se Chapter 93A liability:  the text of Chapter 93A itself, or the text of an independent statute," McDermott, 775 F.3d at 122, plaintiffs offer another theory:  that breach of warranty is a per se chapter 93A violation because under the Magnuson-Moss Warranty Act (MMWA), 15 U.S.C. § 2310(d)(1), it is unfair and deceptive for a "supplier, warrantor, or service contractor" to fail to comply with an obligation to a "consumer" under a written warranty.  See also 15 U.S.C. § 2310(b) (stating that it is an unfair practice to violate any prohibition listed in this chapter, including § 2310(d)(1)).  This argument, however, comes far too late for us to pay it any mind:  Plaintiffs did not sue under the MMWA, nor did they argue to the district court that the breaches of warranty they proved at trial satisfy the elements of an MMWA claim; plaintiffs gave neither Hylas nor the district court the opportunity to consider this theory, and the district court accordingly made no related findings of fact or conclusions of law.  The raise-or-waive rule bars plaintiffs from advancing

this belated argument on appeal.  See Tutor Perini Corp. v. Banc

of Am. Sec. LLC, 842 F.3d 71, 84–85 (1st Cir. 2016).[8]

With neither chapter 93A itself nor the Massachusetts

Attorney General's regulations requiring us to find per se

liability under chapter 93A, plaintiffs are left arguing that the

district court was required, under the facts of this case, to find

that Hylas's breaches of warranty were unfair or deceptive under

chapter 93A.  They do so on two bases:  that the district court's

findings of fact were clearly erroneous, and that its conclusions

of law were incorrect.  We disagree.

The district court found that Hylas failed to deliver a

yacht "in completely sound condition with all systems and equipment

operating safely and properly," in violation of its warranties to

plaintiffs.  But it also found that "Hylas'[s] failure to do so

was due in large part to its inability to conduct sufficient sea

---

[8] In their reply brief and at oral argument, plaintiffs attempted to explain why this is a case in which we should find the raise-or-waive rule does not apply.  See Lang v. Wal-Mart Stores E., L.P., 813 F.3d 447, 455 (1st Cir. 2016) (rejecting an argument that the raise-or-waive rule does not apply).  In essence, their argument—that they "could not reasonably anticipate that the trial judge would conclude that dishonoring express and implied warranties causing $663,774 of damage 'did not in fact produce unfairness or deception'"—is that a party that does not know ahead of time that the court will reject its argument should be forgiven for failing to raise a different one.  A litigant choosing not to make an argument based on an errant assumption that a different argument will succeed is not the type of "extraordinary circumstance" that allows one to circumvent the raise-or-waive rule.  If it were, there would be no raise-or-waive rule.

trials, which was motivated by nothing more than a desire to please its customer."  In so finding, the district court was referring to the fact that the contract anticipated that Hylas would conduct all sea trials before Sharp finally accepted the yacht and paid all balances due.  As things played out, Hylas forewent completing at least some sea trials it would have otherwise conducted had Sharp not wanted to set sail as soon as possible.  The court explained that

> Sharp's request to close on the sale of the Yacht came suddenly and unexpectedly and Hylas expected to be able to conduct further sea trials after closing.  However, the Yacht left without adequate notice before Hylas had the opportunity to conduct further sea trials.

The district court also found that "[e]ach time Sharp or his crew encountered problems with the Yacht, Hylas attempted to resolve the problem."  Plaintiffs argue that these factual findings were clearly erroneous because the court "ignored" (1) evidence that Jachney did not believe plaintiffs prematurely departing from port caused problems; (2) extensive evidence showing that plaintiffs repeatedly sought repairs for numerous failures over many months; (3) evidence showing Hylas did not reimburse plaintiffs for the cost of replacing the boom, despite the contract between the parties requiring Hylas to reimburse Sharp for costs incurred in fixing the yacht; and (4) Hylas's failure to respond to plaintiffs' demand letter, sent prior to commencing suit.

The district court, however, did not ignore this evidence. The court expressly found that plaintiffs "served on Hylas a demand for relief under Chapter 93A, Section 9," and that "Hylas made no substantive response and no offer of settlement." It noted that Sharp incurred the cost of replacing the boom, and it agreed with the jury that Hylas failed to live up to its express warranty to reimburse plaintiffs for costs associated with fixing the yacht. It listed the numerous occasions on which Destiny needed to be repaired, and observed that Hylas's repairs were "ineffectual." And although the record included an email from Jachney stating that "[t]he timing . . . as far as shaking the yacht down I do not think was an issue," other evidence in the record supports the district court's determination that Hylas intended to do more extensive testing before plaintiffs took possession of the yacht: The district court considered an email from Jachney two days before closing disclosing his intention to take the yacht out for a test sail and Jachney testified that Sharp's request to close on the yacht in early December 2010 came suddenly and did not provide adequate time to finish testing. The email plaintiffs cite also sheds no contrary light on the district court's conclusion concerning Destiny's abrupt departure from Newport in June 2011, when Jachney again emailed Sharp stating that he intended to participate in sea trials before Destiny departed Newport.

In light of these factual findings, we cannot say that the district court erred as a matter of law in finding that "Hylas'[s] actions constituted a breach of contract and breach of express and implied warranties," but that the breaches of warranties in this case "did not in fact produce unfairness or deception."  While it is true that "[g]enerally, a breach of warranty constitutes a violation of [chapter 93A]," Maillet v. ATF-Davidson Co., 552 N.E.2d 95, 100 (Mass. 1990), neither the Massachusetts legislature nor the Supreme Judicial Court has gone so far as to find that all breaches of warranties are inherently deceptive or unfair.  See Evans v. Lorillard Tobacco Co., 990 N.E.2d 997, 1038 n.25 (Mass. 2013) ("[W]e decline, as we did in Maillet, to decide whether liability should be 'imposed automatically under [Mass. Gen. Laws ch. 93A] whenever a defendant has violated the warranty of merchantability,' even where there is no finding of negligence.").  Where, as here, the district court finds (without clearly erring) that the defendant made genuine but ultimately ineffectual efforts to live up to its contractual obligations, the mere breach of express and implied warranties is not sufficient to mandate a finding of liability under chapter 93A.

### III.  Conclusion

For the foregoing reasons, we affirm.