# United States Court of Appeals
## For the First Circuit

No. 09-1543

UNITED STATES OF AMERICA,

Appellee,

v.

JAMES LAURENT,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Steven J. McAuliffe, U.S. District Judge]

Before

Lynch, Chief Judge,

Boudin and Lipez, Circuit Judges.

Richard L. Goldman, by appointment of the court, with whom Orlen and Goldman was on brief for appellant.
Seth R. Aframe, Assistant United States Attorney, with whom John P. Kacavas, United States Attorney, was on brief for appellee.

June 17, 2010

**BOUDIN**, **Circuit Judge**.  On November 17, 2006, a confidential informant told an undercover officer--New Hampshire state trooper Melissa Robles--about a man who was selling crack cocaine in Manchester.  At Robles' request, the informant called the man to arrange a meeting.  That afternoon, the informant and Robles drove to a supermarket parking lot in Manchester where a man arrived, driving alone in a maroon Chevrolet Malibu with Connecticut license plates, and introduced himself as "Frenchie."

Frenchie entered Robles' car and--after ensuring that Robles was neither wired nor armed--sold her a baggie containing 0.86 grams of crack cocaine, taken out of a stash of several baggies, in exchange for $100 in cash (whose bill numbers had been recorded).  Robles and Frenchie talked briefly after the sale, and then Robles and the informant drove away.  A surveillance team observed Frenchie, including his entry into and exit from Robles' car.

Between November 2006 and July 2007, Robles made five other purchases of crack cocaine from Frenchie: on November 29, 2006 ($200 for 1.96 grams); December 11, 2006 ($300 for 3.23 grams); January 9, 2007 ($200 for 2.36 grams); March 19, 2007 ($200 for 2.36 grams); and July 18, 2007 ($200 for 1.33 grams).  All but the last purchase occurred in the afternoon in broad daylight; and Robles said it was still light out during the last, even though it was in the evening.

The surveillance team observed most of these transactions. They also watched Frenchie before and after some of them, observing him on several occasions entering with a key and exiting a house at 196 Lowell Street in Manchester, which they concluded was a base for his drug operations. Audio recordings were made of some of the meetings between Robles and Frenchie, and of some phone calls between Robles, Frenchie and two others.

One of the other phone call participants was Frenchie's cousin "Zeus" (whom Robles later identified as Jean Verdiner); Frenchie referred Robles to Zeus on one occasion when Frenchie was not available to sell drugs and Robles then purchased drugs from Zeus. The second participant was a man Robles knew as "Blaze" (whom Robles later identified as Wilfrantz Verdiner); the silver Chevrolet Impala that Frenchie drove to the March 19 and July 18, 2007, transactions was registered in Wilfrantz's name, which also appeared on the 196 Lowell Street mailbox.

In between those last two transactions, Robles applied--on March 26, 2007--for an arrest warrant, supplying an affidavit that identified the subject of the warrant as "Frenchie," a black male who lived at 196 Lowell Street in Manchester. Robles arranged with Manchester police officers to make that arrest on August 22, 2007. That evening, Robles called Frenchie to set up a transaction and the two met in a supermarket parking lot in Hooksett.

Frenchie arrived alone, driving the silver Impala that he had driven to the two prior transactions. He was holding a wad of tissues when Robles approached his car. When Frenchie opened the wad, a small bag fell onto the passenger seat. Reaching through the car window, Robles placed $200 in marked bills on the seat and took the bag, which contained 2.47 grams of crack cocaine. After the purchase, Robles' supervisor directed Manchester police sergeant Robert Moore to effect Frenchie's arrest.

A member of the surveillance team for some of the prior transactions, Moore was parked in the same lot as Robles and Frenchie on August 22, 2007, and observed them conversing through Frenchie's car window. Moore and fellow officer Stephen Coco, another member of the team, watched Robles drive off and then independently followed Frenchie's car until two other Manchester officers stopped it, with Moore and Coco (as well as another member of the surveillance team) confirming from afar that the correct car had been stopped.

The driver, ordered to exit the silver Impala, was James Laurent, whom Moore and Coco later identified as Frenchie both from seeing him and from his driver's license photograph. In the course of the arrest, the officers found $990 in cash on Laurent's person, including the marked $200 from Robles' drug purchase money and--stuffed into Laurent's waistband--marijuana and a clear plastic bag

containing 5.73 grams of crack cocaine. The car also contained four cell phones.

Laurent was indicted on seven counts of distributing crack cocaine (the seven transactions already described) and one count of possession with intent to distribute crack cocaine (the cocaine seized upon his arrest). 21 U.S.C. § 841(a)(1) (2006). He filed two motions to suppress evidence seized and statements made in connection with his August 22, 2007, arrest. The district judge denied both motions.

In the jury trial that followed, Laurent did not testify, but his primary defense was misidentification--that he was not Frenchie, and that instead Frenchie might have been Jean Verdiner, Wilfrantz Verdiner, or Shoubert Beauchamps (a man who also reportedly lived at 196 Lowell Street). Laurent's counsel emphasized that the government had no "physical evidence connecting Mr. Laurent to these charges," specifically, no photographs or video recordings of the meetings between Frenchie and Robles, and no fingerprint evidence connecting Laurent to the bags of crack cocaine.

During cross-examination of Robles, Laurent and his counsel learned for the first time that a video recording had been made of the first drug deal on November 17, 2006. Robles explained upon further questioning that no video had been offered or would be at trial because when she requested it from the Manchester Police

-5-

Department a few months after Laurent's arrest, she learned that the videotape--by then almost a year old--had been routinely erased by the Manchester Police Department pursuant to standard practice.

Laurent promptly filed a motion to dismiss, arguing that the video's destruction and the failure to timely disclose its creation and destruction had deprived him of material, potentially exculpatory evidence. Robles said she had advised the federal prosecutor of the loss; and the prosecutor conceded that in the course of pretrial discovery, she must have learned of the tape and failed to inform Laurent of its creation and destruction, but she said her omission was unintentional. In response, the court dismissed the first count against Laurent--the count predicated on the November 17, 2006, drug transaction.

The jury convicted Laurent on the seven remaining counts--six of distribution and one of possession with intent to distribute--and found that the drug weight for the last count was greater than 5 grams. Rejecting arguments for a lower sentence, the court imposed a sentence of 84 months' imprisonment. Laurent now appeals from his conviction and sentence.

Laurent's main arguments on appeal concern the videotape. In considering his claims, we are concerned with two events rather than one: the erasure of the tape by the local police and the failure by the federal prosecutor to disclose before trial the prior existence of the tape and its erasure to Laurent. It is not

clear that the erasure can be held against the United States, which apparently did not control the investigation and certainly did not erase the tape; but even if we simplify matters by assuming otherwise, the destruction itself does not give Laurent a viable claim.

Arizona v. Youngblood, 488 U.S. 51, 57-58 (1988), and related cases do recognize a due process violation where the government destroys evidence in a criminal case, but not in all circumstances. The Supreme Court has distinguished between evidence that was apparently exculpatory before the evidence was destroyed, for which the failure to preserve is a due process violation even without bad faith, and evidence that was only "potentially useful" for the defense, for which the defendant must establish the government's bad faith to show a violation.[1]

Here, the video was only potentially useful, as Laurent's counsel conceded in the district court; indeed, unless the several officers were collectively lying, it is more likely than not--if the seller in the tape were visible--that the tape would have inculpated Laurent. Thus, Laurent must prove bad faith destruction of evidence, but he has pointed to no evidence that would undermine the government's description of a routine erasure, by no means

_____

[1]Illinois v. Fisher, 540 U.S. 544, 549 (2004) (per curiam); California v. Trombetta, 467 U.S. 479, 485, 488-89 (1984); Olszewski v. Spencer, 466 F.3d 47, 55-56 (1st Cir. 2006), cert. denied, 550 U.S. 911 (2007); United States v. Femia, 9 F.3d 990, 993 (1st Cir. 1993), cert. denied, 516 U.S. 936 (1995).

uncommon, e.g., United States v. Garza, 435 F.3d 73, 75-76 (1st Cir.), cert. denied, 547 U.S. 1158 (2006); United States v. Lewis, 40 F.3d 1325, 1340 (1st Cir. 1994); United States v. Arra, 630 F.2d 836, 849 (1st Cir. 1980), nor were the circumstances here suspicious.

Laurent's second argument, directed against the government's delayed disclosure, does implicate the United States, because the federal prosecutor (by Robles' account) was told of the tape. Brady v. Maryland, 373 U.S. 83, 87 (1963), requires the prosecutor to produce exculpatory evidence to the defense and this could conceivably include information that someone--even a private citizen--had destroyed exculpatory evidence. But, of course, the tape was not shown to be exculpatory and, as we shall explain, its destruction provided no basis for an inference helpful to Laurent.

However, the district court found that putting Brady to one side, there had nevertheless been a violation of Federal Rule of Criminal Procedure 16, which governs pre-trial disclosure by federal prosecutors in criminal cases. Fed. R. Crim. P. 16(a), (c). Whether or not this is so,[2] the government wisely does not dispute that it should have disclosed information about a destroyed piece of tangible evidence previously in police hands. Instead,

---

[2]The rule's language arguably required only that the government produce the tape if it had it; the most pertinent language in Rule 16 requires that "material" items of various kinds be disclosed to the defense, but the items are all seemingly tangible or arguably so in context. Fed. R. Crim. P. 16(a)(1).

the government says that by dismissing the count directed at the videotaped transaction, any possible prejudice was removed--ample sanction for an inadvertent failure to disclose.

To the extent that the nondisclosure was a violation, of either Brady or Rule 16, we review the district court's remedy for abuse of discretion. United States v. Soto-Beniquez, 356 F.3d 1, 30-31 (1st Cir.), cert. denied, 541 U.S. 1074 (2004); United States v. Josleyn, 99 F.3d 1182, 1196 (1st Cir. 1996). Where an error is unintentional, remedying prejudice is usually the key concern.[3] Laurent's only claim of prejudice from the nondisclosure is that had disclosure been made, his counsel in opening argument would not have said: "You would think that the government who has, entirely has the burden, would maybe take a little videotape of this drug transaction or these drug transactions. No."

Laurent argues that when Robles then revealed in cross-examination that one video had been made--even though it was now unavailable--it undermined his counsel's credibility in the

---

[3]United States v. Van Anh, 523 F.3d 43, 51 (1st Cir.) (requiring the defendant to show prejudice from a Brady violation), cert. denied, 129 S. Ct. 236 (2008); United States v. Alvarez, 987 F.2d 77, 85 (1st Cir.) (same for Rule 16 violation), cert. denied, 510 U.S. 849 (1993). Prejudice from delayed disclosure is variously described. E.g., United States v. Devin, 918 F.2d 280, 290 (1st Cir. 1990) ("given timeous disclosure [of the pertinent information], a more effective [defense] strategy would likely have resulted"); United States v. De La Rosa, 196 F.3d 712, 716 (7th Cir. 1999) (when defendant "is unduly surprised and lacks an adequate opportunity to prepare a defense, or when the violation substantially influences the jury").

jury's eyes.  However, defense counsel was free to make clear that any misstatement was the government's fault; and, more important, it did not undermine counsel's consistent theme, from opening to closing and in between: that the government could offer no physical evidence--such as videotapes--to corroborate its officers' identification of Laurent as Frenchie, and that it instead would rely on "words, and words alone."

In fact, Robles' delayed revelation arguably helped Laurent's misidentification argument since his counsel wove the incident into his theme that the government had been "deceptive, and that they have been hiding things, and you should hold that against them," combining the videotape's destruction with the government's failure to present as a witness the confidential informant who initially introduced Frenchie to Robles, and arguing that this evidence was perhaps not presented because it would have revealed that Laurent was not Frenchie.

Finally, no tweaking of defense counsel's argument could have made any difference.  Multiple members of the surveillance team identified Laurent as Frenchie;  he was seen making multiple drug deals almost all in daylight with an undercover officer; and surveillance followed his car from the last drug transaction to the stop where officers found marked bills and more drugs on his person.  Dismissal of the entire case--a rare remedy that is deemed "drastic," Soto-Beniquez, 356 F.3d at 30,  and "draconian," United

-10-

States v. Candelaria-Silva, 162 F.3d 698, 703 (1st Cir. 1998)--
could scarcely have been justified.

Alternatively, Laurent claims that at a minimum a
continuance should have been granted so his counsel could
investigate further the details of the destruction.  But while
counsel did request a continuance and discovery as a possible
lesser remedy in his written motion to dismiss the entire case,
Laurent did not advocate a lengthy continuance when discussing the
motion with the judge and prosecutor and he did not push for a
longer continuance when the government suggested a short one.

Sanctions aside, Laurent argues that the district court
should have instructed the jury that it could draw an adverse
inference from the destruction of the video.[4]  He had proposed the
following instruction, which the court did not give:

> Evidence has been heard that the
> prosecution and its agents at one time
> possessed a videotape of the alleged drug sale
> occurring on November 17, 2006.
>
> You may assume that such evidence would
> have been unfavorable to the prosecution only
> if you find by a preponderance of the evidence
> that:
> > (1)  The prosecution and its
> > agents negligently destroyed or

---

[4]The heading of the argument in Laurent's brief suggests that
he is attacking the failure of the district court to allow an
inference based on the delayed disclosure rather than the erasure
of the tape; but, as this is neither the instruction sought in the
district court nor the error urged below the heading, we ignore
this variation.

-11-

caused the evidence to be
destroyed; or
(2) The prosecution and its
agents caused the evidence to be
destroyed in bad faith.

The government says that this claim is subject only to plain error review because no objection was made after the court charged the jury. Compare Fed. R. Crim. P. 30(d) (requiring objection "before the jury retires to deliberate" or else plain error review applies), with Fed. R. Civ. P. 51(b)(2), (c) (allowing objection before closing arguments and jury instructions to preserve appellate rights). We bypass the government's waiver argument because the refusal to give the charge was not error at all.

A "spoliation" instruction, allowing an adverse inference, is commonly appropriate in both civil and criminal cases where there is evidence from which a reasonable jury might conclude that evidence favorable to one side was destroyed by the other. 4 L. Sand et al., Modern Federal Jury Instructions § 75.01 (instruction 75-7), at 75-16 to -18 (2010). The burden is upon the party seeking the instruction to establish such evidence. 4 Sand et al., supra, § 75.01, at 75-18; United States v. Lopez-Lopez, 282 F.3d 1, 18 (1st Cir.) ("[A] defendant is not entitled to an instruction on a defense when the evidence in the record does not support that defense."), cert. denied, 536 U.S. 949 (2002).

-12-

In general, the instruction usually makes sense only where the evidence permits a finding of bad faith destruction; ordinarily, _negligent_ destruction would not support the logical inference that the evidence was favorable to the defendant. 4 Sand et al., _supra_, § 75.01, at 75-17. But the case law is not uniform in the culpability needed for the instruction[5] and, anyway, unusual circumstances or even other policies might warrant exceptions. Consider, for example, negligent destruction of a particular piece of evidence likely to be exculpatory or routine destruction of a class of such evidence--neither variation being present here.

In all events, above all else an instruction must make sense in the context of the evidence, and no adverse-inference instruction would make sense here. The routine erasure of a video surveillance tape by the Manchester Police Department after much

---

[5]_E.g._, _Buckley_ v. _Mukasey_, 538 F.3d 306, 322-23 (4th Cir. 2008) (mere negligence not enough, intentional conduct--but not bad faith--required); _United States_ v. _Artero_, 121 F.3d 1256, 1259-60 (9th Cir. 1997) (bad faith required), _cert. denied_, 522 U.S. 1133 (1998); _Bashir_ v. _Amtrak_, 119 F.3d 929, 931 (11th Cir. 1997) (same); _Aramburu_ v. _Boeing Co._, 112 F.3d 1398, 1407 (10th Cir. 1997) (same); _Gumbs_ v. _Int'l Harvester, Inc._, 718 F.2d 88, 96 (3d Cir. 1983) (suppression of the evidence must be intentional, not accidental); _Residential Funding Corp._ v. _DeGeorge Fin. Corp._, 306 F.3d 99, 101, 108-10 (2d Cir. 2002) (negligent destruction is enough if other indications suggest the evidence would have favored the party affected by the destruction). Our own decision in _Nation-Wide Check Corp._ v. _Forest Hills Distribs., Inc._, 692 F.2d 214, 217-20 (1st Cir. 1982), is not entirely clear on this point. _See also_ _Blinzler_ v. _Marriott Int'l_, 81 F.3d 1148, 1159 (1st Cir. 1996) (stating that the factfinder is "free to reject" the adverse inference when it believes the evidence was "destroyed accidentally or for an innocent reason").

time had elapsed without an arrest creates no inference that the tape was destroyed because it contained evidence favorable to the defendant. Cf. Pimentel v. Jacobsen Fishing Co., 102 F.3d 638, 640 n.1 (1st Cir. 1996) (finding a district court's refusal to draw an adverse inference from an inadvertent destruction of evidence to be neither clear error nor an abuse of discretion).

Admittedly, this explanation of what happened rests on Robles' testimony, but it was given under oath and was not implausible. If Laurent's counsel seriously doubted the explanation, he could have said why and pressed unequivocally for an opportunity to conduct discovery about it. He did neither and, given the dismissal of the count in question, his course was hardly unreasonable: nothing suggested that the police had erased this particular tape for any reason beyond the passage of time.

Laurent next argues that the district court should have granted his motions to suppress--on two different grounds--the evidence seized and Laurent's statements made upon his August 22, 2007, arrest. The first is that the arrest warrant issued on March 26, 2007, was tainted by Robles' affidavit stating that Frenchie lived at 196 Lowell Street when in fact (Laurent says) she believed Frenchie resided out of state and used 196 Lowell Street as a base for drug operations.

Given Frenchie's observed access to and use of the premises, the discrepancy appears trivial and no basis for a

-14-

hearing pursuant to <u>Franks</u> v. <u>Delaware</u>, 438 U.S. 154 (1978). Further, the arrest warrant was unnecessary and invalidating it would not change the outcome: the arrest was amply supported by probable cause--the observations of the August 22, 2007, offense by several officers who collectively confirmed that Laurent was the man observed committing that offense--and was therefore independently valid without the need for a warrant. <u>United States</u> v. <u>Link</u>, 238 F.3d 106, 109 (1st Cir. 2001).

Laurent's second ground for suppression rests on the premise that the officers found the drugs in Laurent's car and not on Laurent's person--a premise that is far from settled.[6] He then argues that the officers exceeded the bounds of their authority, under <u>Terry</u> v. <u>Ohio</u>, 392 U.S. 1 (1968), by searching his car as part of a mere traffic stop rather than only patting him down for weapons. Of course, if the drugs were found on Laurent, a full search of his person and not a mere pat down was permitted incident to his lawful arrest. <u>United States</u> v. <u>Vongkaysone</u>, 434 F.3d 68, 75 (1st Cir.), <u>cert. denied</u>, 547 U.S. 1142 (2006).

Even if the drugs were found in the car and not on Laurent's person, the car search was permitted because there was

---

[6]The claim rests on Laurent's interpretation of an audio recording of the arrest; but in fact, the excerpt of the audio recording transcript does not clearly support his factual claim, which was directly contradicted by the searching officer's testimony that the drugs were found on Laurent's person.

probable cause to suspect drugs would be found there, given that officers had followed the car immediately after a drug transaction involving Laurent and given Laurent's tendency in prior transactions to sell crack cocaine out of a stash of multiple bags that he had with him. Maryland v. Dyson, 527 U.S. 465, 467 (1999) (per curiam); United States v. Lopez, 380 F.3d 538, 543-45 (1st Cir. 2004), cert. denied, 543 U.S. 1074 (2005). "Police may search a vehicle incident to a recent occupant's arrest . . . [if] it is reasonable to believe the vehicle contains evidence of the offense of arrest." Arizona v. Gant, 129 S. Ct. 1710, 1723-24 (2009).

Finally, Laurent argues that the district court erred in determining his sentence because it relied upon incorrect factual assumptions about crack cocaine. Based on the convictions, the amount of drugs and Laurent's criminal history, the court found his total offense level to be 24 and his criminal history category to be IV, yielding a sentence range of 77 to 96 months. The sentence imposed was in the middle of the range. Laurent does not now claim that the range was incorrectly calculated.

Rather, Laurent requested a lower sentence, arguing among other things that the court should downward depart to mitigate the powder cocaine/crack cocaine sentencing disparity under the guidelines. In refusing this request, the sentencing judge said-- in comments now assailed by Laurent--that crack cocaine is "more devious," "more addictive," "more dangerous," "more destructive,"

-16-

and "more devastating to society than powder cocaine" and that therefore crack cocaine distribution offenses are at "a higher culpability level."

On this appeal, Laurent claims that in Kimbrough v. United States, 552 U.S. 85, 97-98 (2007), the Supreme Court recognized these facts as disproved, and he asserts that the Justice Department supports legislation to "completely eliminate the sentencing disparity between crack cocaine and powder cocaine," e.g., Unfairness in Federal Cocaine Sentencing: Is It Time to Crack the 100 to 1 Disparity: Hearing Before the Subcomm. on Crime, Terrorism, & Homeland Sec. of the H. Comm. on the Judiciary, 111th Cong. 28 (2009) (statement of Lanny A. Breuer, Assistant Att'y Gen., Criminal Division, U.S. Department of Justice).

Kimbrough took note of the extreme sentencing disparity then existing under the guidelines and held that a district court may depart downward based on policy disagreement with the guidelines' disparity, but the Court did not require a departure or a variance. 552 U.S. at 91, 101; accord Spears v. United States, 129 S. Ct. 840, 843-44 (2009) (per curiam); United States v. Gibbons, 553 F.3d 40, 46 (1st Cir. 2009). The district court was aware of its option to depart downward on that basis, but declined to exercise it.

Further, the disparity on which Kimbrough cast doubt was the then-applicable crack-powder sentencing disparity that was

-17-

particularly extreme, see 552 U.S. at 91, and subsequent amendments to the guidelines shrank that disparity by reducing the offense levels for crack cocaine offenses, U.S.S.G. app. C, amend. 706 (Supp. Nov. 1, 2009). Laurent benefited from those reductions because his sentencing range was determined by the revised guidelines.

Neither Kimbrough nor the Sentencing Commission has declared that no sentencing disparity can be justified; and Congress and the Commission continue to believe some disparity is justified by differences in the two drugs' addictiveness, propensity to involve weapons or injury, and association with higher levels of crime. Kimbrough, 552 U.S. at 98-99, 105; U.S. Sentencing Comm'n, Report to the Congress: Cocaine and Federal Sentencing Policy 32, 62 (May 2007). That the Justice Department may favor a change in legislation does not alter the present law.

Affirmed.