[PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 22-11373

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

DAVID CHAPPELL FEY,
SHARI LYNN GUNTER,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Middle District of Florida
D.C. Docket No. 5:20-cr-00059-JA-PRL-1

_____

Before WILLIAM PRYOR, Chief Judge, and ROSENBAUM and ABUDU, Circuit Judges.

WILLIAM PRYOR, Chief Judge:

This appeal requires us to decide whether evidentiary rulings made during a criminal trial mandate the reversal of the convictions of David Fey and Shari Lynn Gunter for distributing methamphetamine and conspiring to kill and killing a witness to their crimes. We must resolve three issues: first, whether the district court abused its discretion by admitting evidence that Fey tried to hire someone to kill a witness cooperating with federal officials and if so, whether that error was harmless; second, whether the district court plainly erred by declining to instruct the jury on spoliation; and third, whether the district court erred by overruling Fey and Gunter's objection to testimony about a coconspirator's death and by declining to declare a mistrial. Because admission of the evidence of the attempted murder for hire was harmless, the failure to give a spoliation instruction was not plain error, and the admission of the testimony about a coconspirator's death, even if error, was harmless, we affirm.

## I. BACKGROUND

David Fey and his girlfriend, Shari Lynn Gunter, were the subjects of a federal investigation of methamphetamine distribution in Ocala, Florida. In January 2016, one of the distributors' customers, Kristin Brown, agreed to cooperate with the investigators. After Fey and Gunter learned that Brown was cooperating with federal officials, they plotted to kill her by giving her a "hot shot,"

a syringe containing a lethal amount of methamphetamine and fentanyl.

Fey, Gunter, their customer Marcia Jennings, and their friend David Greene were at Fey and Gunter's house in April 2016 when they executed their plan. When Brown arrived, Fey told her that he had something for her in the master bathroom. Brown went into the master bathroom and emerged with a syringe. Brown then took the syringe to a second bathroom next to the living room and closed the door. Moments later, Jennings heard a thud. Gunter then emerged from the master bedroom and tried to open the door to the second bathroom, but Brown's body blocked the door. After forcing her way in, Gunter dragged Brown's unconscious body out of the bathroom and kicked her head.

A few minutes later, Fey, Gunter, and Greene, all wearing latex gloves, carried Brown from the house and placed her in her car. After they wiped down the car, they drove away with two of them following in a truck. Jennings saw these events happen but did not participate. Fearing for her safety, she called her daughter to come pick her up. Before Jennings's daughter arrived, Fey, Gunter, and Greene returned with Brown still in the passenger seat of her car. Greene entered the house and said, "She's coming out of it." Greene then entered the master bedroom and emerged with another syringe, which one of them administered to Brown. They departed again in Brown's car with two of them following in the truck.

The next day, Brown was found dead in her car at a cemetery less than a mile from her house. Her body was slumped in the driver's seat, and there were two syringes on the center console and two more in her purse. The syringes tested positive for methamphetamine. Because tests for fentanyl were unavailable to the sheriff's office, the syringes were not tested for that drug.

The chief medical examiner performed an autopsy the next day. She submitted samples of Brown's blood, eye fluid, liver, and urine to a toxicology lab, which reported lethal levels of methamphetamine and fentanyl. The medical examiner concluded in her report that drug toxicity caused Brown's death and that her death was accidental. The sheriff's office closed the investigation into Brown's death.

In August 2016, Fey was in the Marion County Jail on charges unrelated to this appeal. A fellow inmate, Ricky Zackery, told officials that he had heard Fey discussing Brown's death. Zackery agreed to wear a recording device and meet with Fey. While wearing the device, Zackery and Fey discussed the hot shots used to kill Brown. Fey implied to Zackery that Gunter gave Brown the first hot shot and that Fey gave Brown the second hot shot. Based on this conversation, a federal agent investigating Fey and Gunter decided to interview Gunter. During the interview, Gunter admitted that she and Brown had been at Fey and Gunter's house the day Brown died. The agent reported this information to the state attorney's office and was told that another agent would follow up, but no follow-up occurred.

In 2020, Drug Enforcement Administration officer Jason Webb reopened the case. Contrary to what the sheriff's office had determined in 2016, Webb believed there was foul play in Brown's death. Key evidence raised his suspicions: there were multiple syringes found at the scene, and those syringes had not been used and were on the car's console and in Brown's purse instead of on her body; phone records established that Brown had driven from Fey's house past her own home to arrive at the cemetery; and the passenger door was ajar, which suggested that Brown was with another person when she died.

Webb interviewed Fey and Gunter. Gunter denied involvement in Brown's death and told Webb that Fey falsely bragged about being involved to impress girls. But Fey told Webb that Gunter had given two hot shots to Brown: the first was the syringe Brown used in the bathroom of Fey and Gunter's home, and the second was administered by Gunter in Brown's car. Fey said that Greene drove Brown's body to the cemetery and that Gunter and Greene staged the scene to make it look like an overdose. Fey told Webb that he knew before her death that Brown was an informant. He denied involvement and did not mention that Jennings was also present that night. Fey disclosed that he previously discussed Brown's murder with a former girlfriend and a customer.

Webb also interviewed Fey's former girlfriend, who told Webb that Jennings witnessed Brown's death. So Webb went to Jennings's house and identified himself as a Drug Enforcement Administration agent. Jennings immediately told Webb what she had

seen the night of Brown's death. Webb also tried to locate Greene but could not interview him because Greene had died of an overdose in 2018.

A grand jury indicted Fey and Gunter. The indictment charged them with conspiracy to kill Brown with the intent to prevent her from sharing information about the possible commission of a federal offense, 18 U.S.C. §§ 1512(a)(1)(C), (a)(3)(A), (k); *id.* § 1111; killing Brown with the intent to prevent communication with federal officials, *id.* §§ 1512(a)(1)(C), (a)(3)(A); *id.* § 1111; *id.* § 2; conspiring to distribute a mixture of fentanyl and methamphetamine to Brown, causing her death, 21 U.S.C. §§ 846, 841(b)(1)(C); and distributing methamphetamine, *id.* §§ 841(a)(1), (b)(1)(C); 18 U.S.C. § 2.

While in jail, Fey spoke to another detainee, Joshua Reed, about the criminal charges. Fey and Reed already knew each other and had previously discussed Brown's death. In jail, Fey told Reed that he had been charged with murder and implied that Jennings was a witness for the prosecution. Fey asked Reed to kill Jennings by burning her mobile home while she occupied it. Fey told Reed that if he could kill Jennings, Fey's problems would go away. Reed, also a friend of Jennings, was shocked by Fey's request and told a jail investigator about it. The investigator alerted Webb, and Webb obtained surveillance footage of Fey and Reed's meeting.

Before trial, Fey and Gunter moved to exclude Brown's autopsy results. The lab had destroyed Brown's samples in June 2018 under its retention policy because the medical examiner did not

request their preservation and the sheriff had closed the investigation of Brown's death. The prosecutors filed the medical examiner's report and the toxicology report with the district court. Fey and Gunter then withdrew their motion to exclude and instead requested a jury instruction that officials had negligently destroyed Brown's tissue samples before the defense's expert pathologist or doctor could examine them. The district court denied the request on the ground that no evidence supported a finding that officials had been negligent. The district court told Fey and Gunter that they could explore the issue at trial and request the jury instruction again before the jury deliberated. Fey and Gunter did not raise the issue again.

Fey and Gunter also objected to prosecutors calling Reed to testify about Fey's solicitation of someone to murder Jennings. In their pretrial brief, prosecutors previewed that a witness could testify about the threat Fey made on Jennings's life. Prosecutors mentioned Reed and the threat against Jennings only in the section of their pretrial brief that described the underlying facts. The prosecutors did not identify the threat as character evidence under Federal Rule of Evidence 404(b). In the section of their pretrial brief about evidence to be admitted under Rule 404(b), the prosecutors stated only that they would offer testimony about Fey's and Gunter's "efforts to conceal their illegal conduct from law enforcement."

The prosecutors provided notice of Reed's testimony in their proposed jury instructions, which were filed the same day as

their pretrial brief. In their proposed jury instructions, the prosecutors described Reed's testimony about the threat against Jennings as evidence of consciousness of guilt and requested a limiting instruction. Fey and Gunter argued that Reed's testimony was inadmissible character evidence and that prosecutors had not complied with the written-notice requirement of Rule 404(b)(3). After Reed made a proffer, the district court overruled the objection on the ground that although Reed's testimony fell within the rule, the prosecutors' pretrial brief thoroughly outlined Reed's testimony and provided Fey and Gunter ample notice. The district court allowed Reed's testimony.

Fey and Gunter also objected to prosecutors eliciting testimony from Webb about Greene's death to imply that Fey and Gunter were involved. The district court asked the prosecutors if they intended to introduce evidence that Fey and Gunter killed Greene. The prosecutors said that they would not. The district court never barred evidence about Greene's death.

At a joint trial, two juries were empaneled—one for each defendant. Jennings testified about the night of Brown's death and that she knew Reed. On cross-examination, Fey and Gunter attacked Jennings's credibility and asked her if the prosecution had paid her for her testimony. Jennings responded that the prosecution paid for her room in a motel because of a threat on her life. Reed also testified that Fey had asked him to kill Jennings by burning her occupied mobile home to make Fey's problems go away. The jail investigator testified that Fey and Reed had conversed in

the jail, and the prosecutors presented video footage, without audio, of Reed and Fey's meeting.

The prosecution called the lab toxicologist who tested Brown's samples. She testified about her findings, and the district court admitted her report into evidence. The medical examiner testified about the toxicology report that the methamphetamine and fentanyl in Brown's system killed her and opined that nothing suggested that Brown died of natural causes. She also testified about the high rate of fentanyl deaths in the county. Fey and Gunter's expert, a pathologist, testified that because Brown's samples had been destroyed, it was impossible to revisit her cause of death and verify that it was a homicide.

Webb testified about his investigation of Brown's death. The prosecutor asked Webb if he had tried to locate Greene as part of his investigation. Webb responded that he did. When the prosecutor asked what he learned, Webb replied, "I learned that he died in 2018 from an overdose." Fey objected on the ground that the mention of Greene's manner of death implied foul play. Fey moved for a mistrial.

The district court overruled the objection and denied the motion for a mistrial. It found that Webb's statement did not imply any foul play, much less Fey and Gunter's involvement. The district court also stated that the juries had heard testimony earlier from the medical examiner about the high rate of fentanyl overdoses, which suggested that fentanyl overdoses are common and not necessarily evidence of foul play.

The district court instructed the Fey jury, as the prosecutors requested, that it could consider Reed's testimony that Fey had solicited a fellow inmate to murder a prosecution witness only for the limited purpose of proving Fey's consciousness of guilt. The district court instructed the Gunter jury that it could not consider Reed's testimony about Fey's threat as evidence of Gunter's guilt or consciousness of guilt. The juries found Fey and Gunter guilty on all counts.

## II. STANDARDS OF REVIEW

Three standards govern our review. We review evidentiary rulings for abuse of discretion, *United States v. Jiminez*, 224 F.3d 1243, 1249 (11th Cir. 2000), but we will not reverse when the error is harmless, *United States v. Barton*, 909 F.3d 1323, 1330 (11th Cir. 2018). When a district court denies a pretrial request for a jury instruction, and the party requesting the instruction does not raise the issue again before the district court instructs the jury, we review the denial for plain error. *United States v. Iriele*, 977 F.3d 1155, 1177 (11th Cir. 2020). We review for abuse of discretion the denial of a motion for a mistrial based on improper testimony. *United States v. Campa*, 529 F.3d 980, 992 (11th Cir. 2008).

## III. DISCUSSION

We divide our discussion in three parts. First, we explain that although prosecutors failed to identify Reed's testimony that Fey solicited him to murder Jennings as evidence under Federal Rule of Evidence 404(b), the error was harmless. Second, we explain why the district court did not plainly err when it declined to

instruct the jury on spoliation. Last, we explain why the district court did not err by overruling Fey and Gunter's objection to Webb's testimony about Greene's death.

### A. Prosecutors Failed to Identify Reed's Testimony Under Rule 404(b), but the Error Was Harmless.

Fey and Gunter challenge the admission of Reed's testimony under Federal Rule of Evidence 404(b). They argue that prosecutors failed to provide the required written notice for this evidence, *see* FED. R. EVID. 404(b)(3), that Reed's testimony was not sufficiently supported, and that his testimony was unduly prejudicial. The United States responds that Rule 404(b) does not apply.

Rule 404(b) governs evidence of any "crime, wrong, or act" committed by a person. *Id.* R. 404(b)(1). It prohibits the admission of evidence of such conduct when offered to prove that, on a particular occasion, the person acted in accordance with that character. *Id.* But evidence of another crime, wrong, or act may be admitted for other purposes, like "proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *Id.* R. 404(b)(2). Rule 404(b) does not apply when evidence of a prior offense is intrinsic to the charged offense. *See United States v. Edouard*, 485 F.3d 1324, 1344 (11th Cir. 2007). Evidence of another crime is intrinsic when the uncharged offense arose out of the same transaction or series of transactions as the charged offense; the evidence is necessary to complete the story of the crime; or the evidence is inextricably intertwined with the evidence of the charged offense. *Id.*

The United States argues that the evidence of Fey threatening Jennings is intrinsic because it was "integral to the charged conspiracy" and because without Reed's testimony, the jury would not know the whole story of the night of Brown's death. *See United States v. Estrada*, 969 F.3d 1245, 1275 (11th Cir. 2020). It also argues that Reed's testimony was evidence of consciousness of guilt and is thus intrinsic. We disagree.

Reed's testimony is extrinsic and within the scope of Rule 404(b). Our precedent treats threats against a witness as evidence of consciousness of guilt and applies Rule 404(b). *See, e.g., United States v. Gonzalez*, 703 F.2d 1222, 1223 (11th Cir. 1983) (analyzing a threat against a witness as consciousness-of-guilt evidence under Rule 404(b)). And Reed's testimony does not fall within any category of intrinsic evidence that we have recognized. Fey's solicitation to murder Jennings was not part of the same transaction or series of transaction as the charged crime; it took place five years after the conspiracy to kill Brown was completed. Although the attempted murder of a witness could be considered an act to cover up a conspiracy, those acts are not considered part of the conspiracy if they occur after the conspiracy is completed. *See United States v. Knowles*, 66 F.3d 1146, 1155 (11th Cir. 1995) ("The Supreme Court has unambiguously held that acts of concealment are not part of the original conspiracy. A conspiracy ends after the central purposes of a conspiracy have been attained." (footnote, citation, and internal quotation marks omitted)). The conspiracy to kill Brown was complete when Brown was murdered, five years before Fey solicited Reed. Nor was Fey's solicitation integral to the

conspiracy or necessary to tell the whole story of Brown's death. *See Edouard*, 485 F.3d at 1344. Reed was not present the night of Brown's death and played no role in the conspiracy to kill her. Considering the time between the two events, and that Jennings—not Reed—would tell the story of Brown's murder, the evidence of the threat that Fey made is extrinsic and governed by Rule 404(b).

To be admissible under Rule 404(b), Reed's testimony about Fey's solicitation must be relevant to an issue other than Fey's character, be supported by sufficient evidence to allow a jury to find that Fey committed the act, and not be unduly prejudicial under Rule 403. *See United States v. Chavez*, 204 F.3d 1305, 1317 (11th Cir. 2000). And, under Rule 404(b)(3), prosecutors must provide reasonable notice of the evidence of other crimes or wrongs that they intend to offer so that the defendant has a fair opportunity to meet it, articulate the permitted purpose for which the prosecutors intend to offer the evidence, and provide that notice in writing before trial or in any form during trial if the district court finds good cause for lack of pretrial notice. FED. R. EVID. 404(b)(3).

We agree with Fey and Gunter that prosecutors failed to provide notice as required by Rule 404(b)(3). Rule 404(b) and the commentary on the 2020 amendments make clear that written notice of character evidence and the non-character purpose for which it is to be introduced is required absent a finding of good cause. *See id*. R. 404(b)(3)(C); *id*. R. 404(b) advisory committee's note to 2020 amendments. The prosecutors failed to identify Reed's testimony as Rule 404(b) evidence in advance of trial. *See* FED. R. EVID. 404(b)

advisory committee's note to 2020 amendments. And the district court did not find good cause for their failure to do so.

Despite the error of failing to provide the required notice, we "will not overturn an evidentiary ruling and order a new trial unless the objecting party has shown a substantial prejudicial effect from the ruling." *Maiz v. Virani*, 253 F.3d 641, 667 (11th Cir. 2001). Substantial prejudice goes to the outcome of the trial. "[W]here an error had no substantial influence on the outcome, and sufficient evidence uninfected by error supports the verdict, reversal is not warranted." *United States v. Drury*, 396 F.3d 1303, 1315 (11th Cir. 2005) (citation and internal quotation marks omitted; *see also Barton*, 909 F.3d at 1331.

The prosecutors' error was harmless. Fey and Gunter had notice of Reed's expected testimony well before trial even though the prosecutors failed to identify it as governed by Rule 404(b). The prosecutors recounted Reed's expected testimony in their pretrial brief, which was filed 126 days before trial, giving Fey and Gunter ample time to prepare. Fey and Gunter could surmise, based on the pretrial brief, that Reed's testimony could fall under Rule 404(b). And the prosecution stated its intention to offer the testimony as evidence of consciousness of guilt in its proposed jury instructions, which were filed the same day as its pretrial brief. The proposed jury instructions and the pretrial brief gave Fey and Gunter notice that a witness would be called to offer testimony that Fey threatened Jennings's life.

Moreover, there was sufficient evidence to support the juries' convictions on the charges related to Brown's murder, even without Reed's testimony about the threat on Jennings's life. Jennings gave an eyewitness account of the night Brown died and explained Fey's and Gunter's involvement. The medical examiner testified that methamphetamine and fentanyl killed Brown. Webb testified about the details of the crime scene that led him to infer that Brown's death was a homicide and not a self-inflicted overdose. Webb also testified that witnesses he interviewed about Brown's death told him that Fey and Gunter killed Brown with hot shots. Because ample evidence besides Reed's testimony supports the conspiracy convictions, the error of admitting Reed's testimony did not affect the outcome. *See United States v. Harriston*, 329 F.3d 779, 789 (11th Cir. 2003) (holding that an error is harmless when "the error had no substantial influence on the outcome and [other] sufficient evidence . . . supports the verdict" (citations and internal quotation marks omitted)).

Fey and Gunter also contend that Reed's testimony should not have been admitted because it was not supported by sufficient evidence. For Rule 404(b) evidence to be sufficiently supported, the prosecution need only provide enough evidence for the district court to conclude that the jury could find, by a preponderance of the evidence, that the earlier bad act had occurred. *United States v. Green*, 873 F.3d 846, 864 (11th Cir. 2017). We have held that detailed testimony satisfies this standard. *See, e.g.*, *United States v. Dickerson*, 248 F.3d 1036, 1047 (11th Cir. 2001); *United States v. Bowe*, 221 F.3d 1183, 1192 (11th Cir. 2000). The prosecution made a proffer, in

which Reed gave a detailed account of his conversation with Fey and of the solicitation to murder Jennings. Fey and Gunter argue that Reed was not credible and that the district court should not have admitted his testimony. But we must defer to the district court's determination that the testimony was credible enough to allow a jury to find that the act occurred. *United States v. Lampley*, 68 F.3d 1296, 1299–1300 (11th Cir. 1995); *United States v. Brazel*, 102 F.3d 1120, 1154 (11th Cir. 1997). And evidence other than Reed's proffer supported his testimony. Surveillance video recorded Reed and Fey's meeting in the jail, and Jennings confirmed that she knew Reed and that she had been moved to a hotel for her safety because of a threat against her.

Fey and Gunter also argue that Reed's testimony was unduly prejudicial. The prejudice standard for Rule 404(b) is the same as under Rule 403, *see Chavez*, 204 F.3d at 1317, which allows the district court to exclude relevant evidence "if its probative value is substantially outweighed by a danger of . . . unfair prejudice" or "misleading the jury." FED. R. EVID. 403. Fey and Gunter argue that Reed's testimony misled the jury to believe that Fey's "character is so reprehensible that he has no reservations regarding killing any witness."

Exclusion for prejudice under Rule 403 "is an extraordinary remedy which the district court should invoke sparingly, and the balance should be struck in favor of admissibility." *United States v. Alfaro-Moncada*, 607 F.3d 720, 734 (11th Cir. 2010) (citation and internal quotation marks omitted). Because the district court "is

uniquely situated to make nuanced judgments on questions that require the careful balancing of fact-specific concepts like proba-tiveness and prejudice, . . . we are loathe to disturb the sound exer-cise of its discretion in these areas." *United States v. Troya*, 733 F.3d 1125, 1131 (11th Cir. 2013) (citation and internal quotations omit-ted). "The test under Rule 403 is whether the other acts evidence was dragged in by the heels solely for prejudicial impact." *United States v. McNair*, 605 F.3d 1152, 1206 (11th Cir. 2010) (alterations adopted) (citation and internal quotation marks omitted).

Although testimony that Fey sought to have a witness killed is not flattering, it is not more prejudicial than probative. Reed's testimony also was not admitted solely for prejudicial impact; it was used to counter Fey and Gunter's theory that Brown had killed herself or died of natural causes. Evidence that Fey wanted to kill a witness present on the night of Brown's death undermines Fey and Gunter's argument that they were not involved in Brown's demise.

The district court also reduced the risk of prejudice by in-structing the Fey jury that it could consider the solicitation-of-mur-der evidence only for the limited purpose of proving Fey's con-sciousness of guilt. A limiting instruction of this kind reduces the risk of prejudice so that admitting the evidence of a defendant's earlier bad acts is not reversible error. *See United States v. Ramirez*, 426 F.3d 1344, 1353 (11th Cir. 2005); *United States v. Diaz-Lizaraza*, 981 F.2d 1216, 1225 (11th Cir. 1993). As for Gunter, the district court instructed her jury that it could not consider the solicitation-of-murder evidence as evidence of her guilt or consciousness of

guilt. Limiting instructions like these for the consideration of evidence in relation to a codefendant prevent prejudice. *See Gonzalez*, 703 F.3d at 1224.

### B. *The District Court Did Not Plainly Err by Declining to Instruct the Jury on Spoliation.*

Fey and Gunter argue that the district court erroneously declined to instruct the jury on spoliation of evidence. Fey's counsel requested before trial that the district court instruct the jury that officials negligently allowed Brown's tissue samples to be destroyed before the defense's expert pathologist or doctor could examine them. The district court denied the pretrial request and stated that counsel could explore the issue at trial and raise the instruction request again. But Fey and Gunter did not raise the issue before the case went to the jury. Because Fey and Gunter did not object to the jury instructions before the case went to the jury, we review this issue only for plain error. *See Iriele*, 977 F.3d at 1177. To prevail under plain error review, Fey and Gunter must show that the district court made an error, that the error was plain, and that it affected their substantial rights. *See United States v. Rodriguez*, 398 F.3d 1291, 1298 (11th Cir. 2005).

Fey and Gunter cannot establish plain error. We have never ruled that a spoliation instruction should be given in a criminal trial; we have affirmed its use only in civil cases. *See United States v. Lanzon*, 639 F.3d 1293, 1302 (11th Cir. 2011) (explaining that we have never given a spoliation instruction in the criminal context, but if we did, our precedent from the civil context requires a

showing of bad faith). Likewise, the Eighth Circuit has declined to decide whether a spoliation instruction may be given in a criminal trial but has stated that if the instruction could be given, it would be appropriate only upon a showing of bad faith. *See United States v. Warren*, 951 F.3d 946, 949–50 (8th Cir. 2020). The Fifth and Sixth Circuits have approved the spoliation instruction in the criminal context so long as the destruction was in bad faith. *See United States v. Valas*, 822 F.3d 228, 239 (5th Cir. 2016) (applying the spoliation doctrine in the criminal context and requiring a showing of bad faith, not negligence); *United States v. Boxley*, 373 F.3d 759, 762–63 (6th Cir. 2004) (same). The First Circuit too has held that a spoliation instruction may be given in both the civil and criminal contexts when the evidence permits a finding of bad faith destruction. *See United States v. Laurent*, 607 F.3d 895, 902 (1st Cir. 2010). But unlike the Fifth and Sixth Circuits, the First Circuit noted that unusual circumstances might warrant an exception to the bad faith requirement and allow for a spoliation instruction when the destruction was negligent. *Id.* at 902–03. The First Circuit did not explain in detail when that exception would apply. And it held that the exception would not apply in *Laurent* because the evidence was destroyed as part of a routine destruction before the defendant was arrested. *Id.* at 903.

We need not decide whether a spoliation instruction may be given in a criminal trial because our precedent makes clear that even if it could be given in a criminal trial, the instruction is required only when the absence of material evidence is predicated on bad faith. *See Lanzon*, 639 F.3d at 1302 (citing *Bashir v. Amtrak*, 119

F.3d 929, 931 (11th Cir. 1997)). Negligence is not enough. *See Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1310 (11th Cir. 2009). And, in any event, an error is plain only if binding precedent resolves the issue. *See United States v. Frank*, 599 F.3d 1221, 1239 (11th Cir. 2010). Fey and Gunter fail to identify any precedent from the Supreme Court or this Court requiring a spoliation instruction in a criminal trial when a party alleges that evidence was negligently destroyed.

*C. Even if Overruling the Objection to Testimony about Greene's Overdose and Declining to Declare a Mistrial Was Error, It Was Harmless.*

Fey and Gunter argue that the district court abused its discretion by overruling Fey's objection and denying his motion for a mistrial after Webb testified about Greene's death. They argue that eliciting testimony from Webb that "[Greene] died in 2018 from an overdose" was prosecutorial misconduct because the testimony was irrelevant, a Rule 404(b) violation, and a Rule 403 violation. They argue that this alleged misconduct warranted a mistrial.

Improper questions can rise to prosecutorial misconduct. *See United States v. Rivera*, 780 F.3d 1084, 1096 (11th Cir. 2015). But prosecutorial misconduct requires a new trial only if it prejudiced the defendant's substantial rights. *See United States v. Hernandez*, 145 F.3d 1433, 1438 (11th Cir. 1998). And a defendant's substantial rights are prejudiced only "when a reasonable probability arises that, but for the remarks, the outcome of the trial would have been different." *United States v. Eckhardt*, 466 F.3d 938, 947 (11th Cir. 2006). The district court is best positioned to evaluate the

prejudicial effect of a statement on the jury and determine whether a motion for a mistrial should be granted. *United States v. Newsome*, 475 F.3d 1221, 1227 (11th Cir. 2007).

Even if Webb's testimony about Greene's overdose should not have been elicited, it did not prejudice Fey and Gunter's substantial rights. *See Hernandez*, 145 F.3d at 1438. The record fails to establish that there is a reasonable probability that the outcome of the trial would have been different without Webb's testimony about Greene's death. *See United States v. Young*, 470 U.S. 1, 12 (1985) ("[T]he remarks must be examined within the context of the trial to determine whether the prosecutor's behavior amounted to prejudicial error."). Webb testified only that Greene "died in 2018 from an overdose" in response to the prosecutor's questioning about Webb's attempts to locate and investigate Greene. Fey and Gunter were concerned that the testimony about Greene's cause of death could lead the jury to infer that Fey and Gunter played a role because the prosecution's theory was that Brown died from hot shots administered by Fey and Gunter. But as the district court found, there was no suggestion in Webb's testimony that Fey and Gunter were involved or that foul play was suspected in Greene's death. Webb's testimony did not imply that Greene died from a homicidal hot shot instead of a self-inflicted overdose. And other evidence reduced the risk that the jury would infer foul play. Earlier that day, the jury heard testimony from the medical examiner that death from fentanyl overdose is common. Fey and Gunter do not argue that any evidence or testimony other than Webb's single

statement implied that they were involved in Greene's death. The district court did not abuse its discretion in denying a mistrial.

## IV. CONCLUSION

We **AFFIRM** Fey's and Gunter's convictions.